[No. B108473. Second Dist., Div. Two. Mar. 23, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO SANCHEZ et al., Defendants and Appellants.

462

464

COUNSEL

Angelyn Gates and Lorilee M. Gates for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BOREN, P. J.**—Alfredo Sanchez, Hector Sanchez and Maria Sanchez appeal from the judgments (orders granting probation) entered upon their convictions by jury of contriving, preparing, setting up, proposing or operating an endless chain scheme. (Pen. Code, § 327.) They contend (1) that the trial court erred in failing to instruct the jury that participation in an endless chain is not a violation of Penal Code section 327; (2) that the trial court erred in refusing to dismiss the case or to instruct the jury on concealment of evidence by the prosecution and the victims, as a sanction for discovery violations; (3) that the trial court abused its discretion in denying their motion for new trial on the ground of juror misconduct; and (4) that the evidence was insufficient to support the convictions.

## FACTS

Viewed in accordance with the usual rules on appeal (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established that in 1995 an endless chain scheme known as "Friends Helping Friends" (hereinafter FHF) was in existence in the Los Angeles area. Blanca Leticia Cervantes, Graciela Cazares, Rosa Santana, Milena Sandoval, Silvia Contreras, Carmen Flores and Martha Perez testified for the prosecution that they joined FHF in March 1995. The scheme consisted of numerous pyramids. Meetings were held two or three times a week and were attended by large groups of people constituting the various pyramids. At the meetings, the chairmen spoke to the individuals in the pyramid and to the new people attending, explaining the rules and regulations; they collected money; and they prepared and handed out the pyramid charts. The people attending the meetings were instructed not to tell anyone, particularly law enforcement, about the meetings.

The seven women testified that they attended meetings over a period of several months, commencing in March. Most of the meetings they attended

were at the home of appellant Alfredo Sanchez (hereinafter Alfredo) and his wife, appellant Maria Sanchez (hereinafter Maria).[1] At least one meeting was held at the home of appellant Hector Sanchez (hereinafter Hector). Alfredo and Maria would call the victims two or three times a week to tell them when the next meeting would be held. At the meetings, appellants told the members and prospective members that an individual joined a pyramid by paying $2,000 for a "box," thus becoming one of eight vice-presidents. Each individual was responsible for bringing in more members and, as he did so, he rose in the pyramid hierarchy to one of four executives, then to one of the two presidents, and then to the chairman, at which time he would receive $16,000. Appellants stressed that the money paid into the scheme was guaranteed and risk-free. A participant at the vice-president level could get his or her money back merely by asking, while, at a higher level, an individual could leave the group by selling his or her box.

A booklet of rules governing the scheme, written in English and in Spanish, was kept at Alfredo's house. Only a chairman was permitted to keep a copy of the rules booklet. The rules provided, in part, that investments had to be in cash, that members had to attend every meeting, and that members had to bring in at least one new member before reaching the position of president. If a member did not do so, he would be expelled and the chairman had the opportunity of buying his position.

Alfredo, Maria and Hector conducted the meetings as chairmen, and all three lectured or spoke at most of the meetings, explaining the contents of the rules booklet. The seven women saw all three appellants accepting cash and saw all three filling out and handing out pyramid charts. Several of the women saw all three lecture, although Sandoval never saw Maria do so. Alfredo and Hector were listed as chairmen on various pyramid charts on which the women's names appeared in the lower boxes. Although other persons were listed as chairmen on the charts the women received, the women rarely, if ever, saw these other individuals run a meeting or accept cash.

Cervantes brought $2,000 in cash to her third meeting and gave it to Maria. Perez brought $2,000 in cash to her second or third meeting and gave her money to Alfredo, who conducted the meetings. Flores gave $2,000 in cash to Hector, who made most of the presentation at that meeting. Contreras gave $2,000 to Angelica Flores, who immediately gave it to Hector. Hector conducted the meeting and explained the rules. At her next meeting, Contreras handed over another $2,000 to Hector. Sandoval, Cazares, Santana, and a fourth individual each gave $500 in cash to Alfredo and their names were listed together in one box.

[1] A defense witness testified that this residence was a vacant house.

None of the victims were given a receipt for the money handed in; none were told that the money was being invested in stocks, bonds or mutual funds; each provided the money because she believed the money was guaranteed. None advanced to chairman and none received $16,000.

After several months, the victims did not receive notice of any further meetings. Cervantes called Maria, who told her there would be no more meetings but that she would receive her money back. Although Cervantes left several telephone messages after that for Maria, Maria never called her. Each of the other victims called or visited one or more of the appellants and each was told she was not going to get any money back. Alfredo told Sandoval that he, too, was owed money. When Contreras asked Hector for her money, he referred her to Angelica Flores, who gave Contreras a car of uncertain value for the $2,000 Contreras had given her, and told Contreras to ask Hector for the rest of her money. Hector told her not to bother him. Cervantes had kept a copy of the rules booklet and turned it over to Police Detective Hugh Cepeida, together with pyramid charts.

Detective Cepeida received the pyramid charts and the copy of the rules booklet when the victims came to him in October 1995. After Alfredo's arrest, Cepeida determined that the address of the house used for meetings was the address appearing on Alfredo's driver's license. Cepeida spoke to approximately 10 persons in connection with his investigation, but did not speak to anyone who had become a chairman or who had received $16,000.

An examiner of questioned documents for the Los Angeles Police Department testified that Alfredo wrote the pyramid chart designated People's exhibit 1. Alfredo also wrote some of the entries on the chart designated People's exhibit 10, and all but one box on the chart designated People's exhibit 14. Hector wrote the chart designated defense exhibit K. The expert was not able to identify the writing on a chart designated Defense exhibit N as that of any of the appellants. None of the exhibits he examined matched the handwriting of Maria.

In defense, Hector's niece testified that she attended meetings conducted by persons other than the three appellants, at businesses or homes of persons other than those of appellants. At one meeting, Alfredo conducted the proceedings as a favor to Sandra Torres, the person who had invited her and at whose house the meeting was held. Six of the People's witnesses were present at that meeting. Hector was not present at the meeting at which the niece paid her money to Torres or at any other meeting of which the niece was aware. She attended about 30 meetings at the home of Angelica Flores and one at Alfredo's house, but none of the appellants were present at this

meeting. There was a certain amount of animosity evident during the meetings as people quarreled over which newcomer would be added to whose pyramid.

The niece's boyfriend testified that he attended meetings at Alfredo's house but Alfredo and Maria were not present and other persons were chairmen. He acknowledged that Alfredo and Hector were chairmen of various pyramids and that Maria was also involved.

Hector's sister testified that she attended meetings at the home of Sandra Torres, who was chairman and collected her money. Other meetings were held at the homes of other persons. Hector's sister gave money twice, once to Torres and once to Angelica Flores. Alfredo was a chairman and he spoke to the group at which Torres was chairman. Later meetings were held at Angelica Flores's house and at Alfredo's house. Hector was present at a few of the meetings at Alfredo's house but his sister had not seen him at earlier meetings. Another sister testified that Hector lost money in the scheme.

Other defense witnesses testified to appellants' reputations for honesty and truthfulness and stated that several of the People's witnesses had reputations for being dishonest.

Appellants elicited testimony from the prosecution witnesses that there were other charts with the victims' names that showed persons other than appellants as chairmen. Cepeida acknowledged on cross-examination that he had not interviewed persons whose names appeared on the charts other than the seven victims. He had not attempted to find Sandra Torres and he had made only one, unsuccessful, attempt to locate Angelica Flores. He did not recall whether he asked the victims at the time he interviewed them if they had other documents. He stated that none of the victims had told him a meeting was held at Hector's house or that Angelica Flores was a chairperson.

## DISCUSSION

### I. *The evidence was sufficient to support the verdicts.*

Penal Code section 327 provides for criminal penalties for "[e]very person who contrives, prepares, sets up, proposes, or operates any endless chain." That section defines "endless chain" as "any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive

compensation when a person introduced by the participant introduces a new participant. Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme."

 Appellants contend that the evidence was insufficient to support their convictions. They argue that the police only interviewed the persons who reported their losses to the authorities, rather than interviewing any other individuals listed on the charts. They claim that the prosecution witnesses lied, in that they did not tell Cepeida that anyone other than appellants was a chairman and attempted to shield their friends from detection as participants. They argue that the witnesses' testimony did not establish that Maria was present or that she spoke at every meeting and that, even if she was a chairman, and lent the use of her home for meetings, her involvement in FHF did not rise to the level required by statute. They argue that Hector lost his money and that his pyramid had not filled up before the meetings ceased. They argue that Alfredo was not present at one of the meetings, he stopped offering the use of his vacant house when he rented it out, and he was owed money when the meetings ceased. They also assert that the handwriting expert was unable to identify any appellant as the writer of the chart designated defense exhibit N and was unable to identify Maria's handwriting on any of the examined documents, and they conclude that there were other individuals involved in making the charts.

It appears that these arguments are merely a request that we reweigh the evidence, which is not the function of an appellate court. "The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] [¶] . . . But it is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury." (*People* v. *Ceja* (1993) 4 Cal.4th 1134, 1138-1139 [17 Cal.Rptr.2d 375, 847 P.2d 55], original italics.) The jury considered the facts presented by the prosecution and by the defense, including the evidence cited by appellants in support of this argument, and concluded that appellants were guilty as charged of violating Penal Code section 327.[2] The fact that other persons may have been chairmen and filled out charts does not detract from appellants' guilt. Substantial evidence, as set forth above, supports the jury's determination.

---

[2]Appellants were found not guilty of grand theft resulting from the taking of money from the victims.

To the extent these arguments constitute a claim that appellants were mere participants in the endless chain scheme, and thus not guilty under the terms of the statue, this claim lacks merit. Ample evidence supports the determination that appellants had the requisite level of involvement to satisfy the statutory prohibition. Appellants do not challenge the conclusion that FHF was, in fact, an endless chain scheme. The role of each appellant as testified to by the prosecution witnesses can aptly be described as that of one who "operate[d]" the endless chain. Appellants called the other individuals to announce the time and location of the meetings, most of which were held at the home of Alfredo and Maria. Appellants then conducted the meetings, lectured at the meetings, explained the rules and requirements, prepared pyramid charts, and collected the money. Again, that other individuals were also chairmen and had meetings in their homes does not establish that all three appellants were not guilty of operating the endless chain scheme. There was substantial evidence to support the determination of the jury that all three appellants were guilty of violating Penal Code section 327.

## II. *The trial court did not err in instructing the jury.*

Appellants contend that the trial court erred in failing to instruct the jury that participation in an endless chain scheme does not constitute a violation of Penal Code section 327. This claim lacks merit.

Appellants requested that the trial court deliver an instruction which stated that mere participation in an endless chain did not violate Penal Code section 327, as follows: "Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a crime. . . . The prosecution has the burden of proving, beyond a reasonable doubt, that the defendants contrived, prepared, set up, proposed, or operated an endless chain. If you have a reasonable doubt that the defendants's conducts was [*sic*] illegal, you must find the defendants not guilty. [¶] Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a crime. However, participation in an endless chain is not a crime. If the evidence establishes the defendant merely participated in an endless chain rather than prepared, set up, proposed, or operated, then it is your duty to acquit the defendants." The trial court declined to give this special instruction, and instructed the jury in the language of the statute.

During deliberations, the jury sent the court a written inquiry which stated, "a) Is participate the same as to operate [¶] b) Is it illegal to participate in an endless chain scheme." The minute order of proceedings on the date this inquiry was presented to the court indicates that "Court and counsel confer re: request. The Court writes response to the jury and at 2:57

p.m. the response is taken into the jury room by the bailiff." Nowhere in the record do the contents of the discussion or of the court's response appear.[3]

Appellants argue that the legislative history of Penal Code section 327[4] compels the conclusion that "the Legislature was targeting organizations that create and instigate selling chain schemes. In this context then the word 'operate' should be defined to include the entity or individual(s) who created FHF, who designed the rules and pyramid charts, but not those who joined and participated by holding meetings, inviting people, and collecting all or some of their pay off."

The documents included in the legislative history indicate that after a bill was introduced which included the words "aids in the operation" among the prohibited types of conduct, the question was raised whether "the mere participation in such a chain operation [would] be a violation of this proposed section? In other words, does every participant 'aid in the operation' of such chain?" The bill was thereafter amended to delete the words "aids in the operation." In a letter to the governor, the senator who introduced the bill stated, "This statute would apply only to the promoters of the scheme, not to the victims."

Despite the language in the legislative history, including the words "selling scheme" and references to "purchasing merchandise" and "firms" that operate "pyramid sales schemes," appellants do not challenge the definition of FHF as an endless chain scheme which existed in violation of Penal Code section 327. While we agree that the legislative history clearly indicates that the statute applies to promoters and not to victims, we observe that in removing the language "[any person who] aids in the operation," which was acknowledged to refer to mere participants, the drafters left intact the language "[any person who] operates."

"'[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' [Citations.]" (*People* v. *Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) A

---

[3]In the statement of facts contained in a written motion for new trial, appellants indicated that defense counsel "requested this questions [*sic*] be answered in the negative. The trial court decided to not answer the jury's question at all." The declarations of the two jurors stated that "the judge did not answer our question or give us further instruction." Inasmuch as the minute order of proceedings indicates that a response of some sort was delivered to the jury, there is an ambiguity which cannot be resolved on the present record.

[4]We take judicial notice of the legislative documents included in appellants' request.

defendant is entitled to have the trial court give a clarifying instruction only where it is supported by substantial evidence. (*Id.* at p. 579.)

 The word "operates" here has its ordinary meaning. Webster's Third New International Dictionary (1993) page 1581 defines "operate" as "to cause to function usu[ally] by direct personal effort: work (~ car) (*operating* a drill press) . . . to manage and put or keep in operation whether with personal effort or not (*operated* a grocery store)." Unlike the words "contrives," "prepares," "sets up" or "proposes," which envision preparatory activity, the word "operates" denotes ongoing conduct which advances the progress of an existing entity. This term stands apart from the others, which describe various stages of formulation of the scheme; one who "operates" a scheme may carry it along after its inception. We reject appellants' claim that "operate" applies only to the creators and designers of the scheme.

The word "operate" does not, however, as the drafters well understood, encompass mere participation, as would the phrase "aids in the operation." The meaning of "operates"—to manage and to keep in operation—clearly precludes "participation" in an endless chain scheme as a basis of guilt. The statutory language with which the jury was instructed encompassed the conduct with which appellants were charged and in plain language sufficiently informed the jury what they were to determine.

As noted above, a defendant is entitled to have the trial court give a clarifying instruction where it is supported by substantial evidence. (*People v. Estrada, supra,* 11 Cal.4th at p. 579.) Here, however, based on the evidence, which clearly established that appellants were engaged in operating the endless chain scheme, further instruction on what was not included in the ambit of the statutory prohibition was unnecessary. Notwithstanding the jury's subsequent inquiry, we find no error in the trial court's refusal of the special instruction at the time it was offered.[5]

III. *The trial court properly refused to impose sanctions for a discovery violation.*

During cross-examination, a prosecution witness mentioned the existence of pyramid charts she had kept in her possession and had not turned over to the police. The witness was ordered to bring them to court; it appears that more than one witness may have provided such charts to the prosecution at this time, and the prosecutor turned copies of these charts over to defense counsel. After several additional charts were produced by witnesses, the

[5]Appellants clarify in their reply brief that they do not challenge the propriety of any response offered by the trial court to the jury's inquiry.

prosecutor provided them to counsel for appellants as well. Appellants moved for dismissal under *Brady* v. *Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215], claiming a discovery violation, in that this material was exculpatory because some of the charts bore the names of people other than appellants as chairmen. Appellants asked, in the alternative, that the jury be instructed that the prosecutor engaged in misconduct.

A hearing was conducted on the motion to dismiss. At the hearing, which was held on a Wednesday, Detective Cepeida testified that he received several documents, denominated defense exhibits E through J, on the previous Friday afternoon from witness Cervantes, and he turned them over to the prosecutor that same day. Witness Perez gave him People's exhibit 10 the day before, Tuesday, and he turned it over to the prosecutor at that time. Witness Flores gave him defense exhibit K Tuesday afternoon, and he then turned that exhibit over to the prosecutor. Another witness, although he could not remember which, gave him defense exhibits L and M on Tuesday, at which time he gave them to the prosecutor. Neither he nor any other member of the police department had possession of any of those documents prior to the previous Friday, and he never instructed any witness to hold documents until the time of trial.

The prosecutor testified that the six documents in defense exhibits E through J came into her possession for the first time on the previous Friday afternoon and she provided copies of them to the defense on the following Tuesday morning.[6] She received the document denominated People's exhibit 10 from Cepeida on Tuesday, the day before, and turned a copy over to the defense on Wednesday morning. She received defense exhibit K either Friday afternoon or Tuesday and gave copies to the defense Wednesday morning. She received defense exhibits L and M either Friday or Tuesday and provided copies to the defense on either Tuesday or Wednesday. She never instructed any witness to hold documents until the day of the trial, and she did not instruct anyone at the police department to hold documents in their possession until the day of trial.

The trial court denied the motion to dismiss, stating, "The court does not find that there has been any violation of the discovery statute nor is there a *Brady* violation. It's the court's finding that the People did not have possession of these charts or grafts [*sic*], did not have—nor did any prosecutorial agency in which they had access to have possession. When they got possession either on a Friday they turned them over on a Tuesday. Or Tuesday they turned them over on a Wednesday. [¶] We could haggle back and forth as to what's immediately turn[ed] over as required by [Penal Code section] 1054

---

[6]The matter had been continued from Friday to Tuesday.

et seq. But that's pretty close. I don't think under *Littlefield* or any cases I've read, outside the area of witnesses and witnesses' addresses, that the People have any affirmative duty to go outside the criminal justice system to ask witnesses for any documents in their possession. [¶] And I might add, parenthetically, that the defense had the names of these witnesses early on in the litigation. They could have—they had just as much access to those witnesses to get those documents as the People did. . . . These documents were just not in the possession of the People prior to just the last few days. Either the constructive or actual possession or in constructive or actual possession of any instrumentality in the criminal justice system."

█ Appellants contend that the trial court should have either dismissed the matter or given the requested defense instruction as a sanction for the discovery violation.[7] They argue that the prosecutor and Cepeida deliberately failed to obtain the exculpatory FHF charts from their witnesses prior to trial, only turned them over when forced to do so during trial, and either negligently or intentionally failed to make any effort to "preserve and insure they disclosed all charts given them during trial."

█ In *Brady* v. *Maryland, supra,* 373 U.S. 83, the court held that ". . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.* at p. 87 [83 S.Ct. at pp. 1196-1197].) In *In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234], the California Supreme Court required the prosecution to disclose substantial material evidence favorable to the defense without a request. (*Id.* at pp. 532-533.) █ Here, as the trial court determined, the prosecutor provided the documents, which in fact were equally available to the defense, to defense counsel as soon as she received them. The defense attorneys employed these documents in the presentation of their cases. We find no *Brady* violation.

Appellants assert that the prosecution abused the discovery process by failing to obtain evidence. █ In *In re Littlefield* (1993) 5 Cal.4th 122 [19 Cal.Rptr.2d 248, 851 P.2d 42], the Supreme Court held that pursuant to the reciprocal discovery provisions of Penal Code section 1054 et seq., the defense was obligated to provide to the prosecution not only the names but also the addresses of prospective witnesses. The court rejected the implication that a party might avoid the duty to disclose information by deliberately

---

[7]Appellants requested that the trial court deliver one of the following two instructions: "If you find that a witness or the prosecution attempted to suppress evidence in any manner, such as by concealing evidence, such attempt may be considered by you as tending to establish the defendant's innocence. [¶] If you find that a witness or the prosecution attempted to suppress evidence in any manner, such as by concealing evidence, you may draw a negative inference from such attempt and hold such attempt against that witness or the prosecution."

refraining from obtaining such information. (5 Cal.4th at pp. 134-135.) The court pointed out, "California courts long have interpreted the prosecutorial obligation to disclose relevant materials in the possession of the prosecution to include information 'within the possession or control' of the prosecution. [Citation.] In *Pitchess* v. *Superior Court* [(1974)] 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305], we construed the scope of possession and control as encompassing information 'reasonably accessible' to the prosecution. In *Engstrom* v. *Superior Court* (1971) 20 Cal.App.3d 240, 243 [97 Cal.Rptr. 484] . . . the court held that materials discoverable by the defense include information in the possession of all agencies (to which the prosecution has access) that are part of the criminal justice system, and not solely information 'in the hands of the prosecutor.' [Citation.] In *People* v. *Coyer* (1983) 142 Cal.App.3d 839, 843 [191 Cal.Rptr. 376], the court described information subject to disclosure by the prosecution as that 'readily available' to the prosecution and not accessible to the defense." (*Id.* at p. 135.)

However, the court defined the scope of the obligation of the prosecution to obtain information for the defense as follows: "[T]he prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense. (See *In re Koehne* (1960) 54 Cal.2d 757, 759 [8 Cal.Rptr. 435, 356 P.2d 179] ['the law does not impose upon law enforcement agencies the requirement that they take the initiative, or even any affirmative action, in procuring the evidence deemed necessary to the defense of an accused']; *People* v. *Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93] [There is no general duty on the part of the police or the prosecution to obtain evidence, conduct any tests, or ' "gather up everything which might eventually prove useful to the defense." ']).)" (*In re Littlefield, supra*, 5 Cal.4th at p. 135, original italics.)

We conclude that the trial court correctly ruled that, under *Littlefield*, the People had no duty to discover the existence of, or to seek or obtain, additional charts not provided to the police by the victims. The trial court properly denied the request for dismissal or sanctions.[8]

IV. *The trial court did not abuse its discretion in denying appellants' motion for new trial on the ground of juror misconduct.*

In a motion for new trial, appellants claimed that the jury had engaged in misconduct by basing the convictions on the belief that participation in an endless chain was prohibited by Penal Code section 327. In

---

[8]Again, once the existence of this evidence came to the attention of the prosecutor, and she obtained the documents, she immediately provided copies of them to defense counsel, who used them in cross-examination of the prosecution witnesses without any request for continuance. Even if we were to find any violation of *Brady* or of the rules of discovery, there was no prejudice. (*People* v. *Robinson* (1995) 31 Cal.App.4th 494, 499-500 [37 Cal.Rptr.2d 183].)

support of the motion, appellants submitted declarations from two jurors, each stating that "some of the jurors, including myself, included 'participation' in the definition of Endless chain" and that jurors "openly discussed during deliberations that participation in the Endless Chain was sufficient to satisfy the elements" of the offense. Appellants contend that this evidence was admissible under Evidence Code section 1150 and that, based on this evidence, the trial court abused its discretion in denying their motion for new trial.[9]

When a defendant moves for a new trial based on jury misconduct, the trial court undertakes a three-part inquiry. "First, the court must determine whether the evidence presented for its consideration is admissible. . . . [¶] Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct. . . . [¶] Finally, if misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial." (*People* v. *Duran* (1996) 50 Cal.App.4th 103, 112-113 [57 Cal.Rptr.2d 635].) In making the determination as to the admissibility of the evidence presented, including declarations of jurors, ". . . the trial court must take great care not to overstep the boundaries established by Evidence Code section 1150." (*Id.* at p. 112.)

Evidence Code section 1150, subdivision (a) provides as follows: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Evidence Code section 1150 permits evidence from jurors regarding " 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration' [but jurors] may not testify to 'the subjective reasoning processes of the individual juror . . . .' [Citation.]" (*In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260].) Evidence Code section 1150 "may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations. In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. [Citation.] But when a juror in the course of deliberations gives the reasons for

---

[9]The trial court denied the motion both for failure to comply with the rules requiring appropriate notice and "on its merits."

his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*People* v. *Hedgecock* (1990) 51 Cal.3d 395, 418-419 [272 Cal.Rptr. 803, 795 P.2d 1260].)

A statement by a juror which itself constitutes misconduct was involved in *In re Stankewitz, supra*, 40 Cal.3d 391, where a juror gave erroneous legal advice, based on his experience as a police officer, to the other jurors. There, ". . . the very making of the statement sought to be admitted would itself constitute misconduct. Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*Id.* at p. 398.)

On the other hand, where, as here, the affidavit or declaration suggests " ' "deliberative error" in the jury's collective mental process— confusion, misunderstanding, and misinterpretation of the law,' " particularly regarding "the way in which the jury interpreted and applied the instructions," the affidavit or declaration is inadmissible. (*Mesecher* v. *County of San Diego* (1992) 9 Cal.App.4th 1677, 1683, 1684 [12 Cal.Rptr.2d 279].) The mere fact that such mental process was manifested in conversation between jurors during deliberations does not alter this rule. (*Id.* at pp. 1683-1684.) In *Mesecher*, the defendants sought a new trial on the ground that the jurors relied upon an erroneous definition of the term "battery," and submitted declarations by several jurors stating that a majority of the jurors had relied on the erroneous definition to reach its verdict. The reviewing court held the declarations inadmissible under Evidence Code section 1150. The declarations submitted by appellants in this case were similarly inadmissible. We point out that this case does not involve the situation where the declarations established that the jurors agreed to disregard the court's instructions; in such a situation, the agreement does not implicate a juror's subjective reasoning process but itself constitutes misconduct. That is not our case. (Cf. *People* v. *Perez* (1992) 4 Cal.App.4th 893, 908 [6 Cal.Rptr.2d 141].)

These declarations were the only evidence offered in support of the alleged juror misconduct. In the absence of any admissible evidence, the motion for new trial was properly denied. (*People* v. *Cox* (1991) 53 Cal.3d 618, 697 [280 Cal.Rptr. 692, 809 P.2d 351].)

## Disposition

The judgments (orders granting probation) are affirmed.

Fukuto, J., and Zebrowski, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 17, 1998.