Filed 3/6/13  Jones v. Drucker CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JAMES JONES,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MICHAEL R. DRUCKER,<br><br>    Defendant and Respondent. | 2d Civil No. B238437<br>(Super. Ct. No. 56-2008-00328693)<br>(Ventura County) |

Appellant James Jones filed a medical malpractice action against respondent Dr. Michael R. Drucker, alleging injuries resulting from hernia surgery.  In this appeal from a judgment in favor of respondent, appellant contends the court abused its discretion in denying his motion for a new trial on the ground of jury misconduct.  The contention essentially turns on an alleged reference made during deliberations by one juror, and then extensively discussed by the panel, that there was no evidence of a standard of care established by the American Medical Association.  We conclude that the declaration in support of the claim of jury misconduct was inadmissible.  (Evid. Code, § 1150, subd. (a).)  We affirm.

# FACTS AND PROCEDURAL HISTORY

## *The Trial*

On July 10, 2007, respondent performed a "plug and "patch" surgery to repair an inguinal hernia in appellant's left groin area. The procedure consists of placing a "plug" in the hernia, which is then "patched" with mesh that can be permeated by human tissue. In accordance with his training, respondent tied the "tails" of the patch together with a single stitch placed behind appellant's spermatic cord. No stitching or other method was utilized to anchor the patch to appellant's body.

The promotional materials for the plug and patch procedure indicate the surgery is relatively pain free and that complications are rare; 95 percent of patients are able to return to their normal activities within three days of the surgery. There is a risk, however, that the patch will migrate or roll, which can cause irritation and lead to scarring of the surrounding nerves.

The day after the surgery, appellant complained of pain in his inner left thigh, scrotum and penis. Based on his experience, respondent concluded that appellant was experiencing typical post-operative pain and that no follow-up was necessary. When appellant visited respondent eight days later, he complained of the same pain. Although the pain was in the area of the ilioinguinal nerve, there was no indication at the time of surgery that the nerve was either near the mesh or had to be moved to avoid any impact. Respondent told appellant that he expected the pain would be gone once he had completely healed.

On August 2, 2007, appellant went to Dantae Davies, M.D., for a second opinion. After conducting an independent evaluation, Dr. Davies recommended "watchful waiting" and told appellant to follow up with respondent. Although Dr. Davies believed that appellant's pain was neurogenic and could be caused by various factors irritating the nerves, he did not diagnose nerve entrapment or recommend surgery at that time.

Appellant presented with the same symptoms when he visited respondent about a month later. Respondent determined at that time that the problem could be nerve

2

related and referred appellant to a pain specialist. Two months later, appellant saw a pain specialist and was referred to another hernia surgeon, Dr. Parviz Amid. In June 2008, Dr. Amid conducted a second surgery and discovered the mesh had rolled up and formed a mass incorporating two nerves. Because the nerves were too entangled to be separated, Dr. Amid removed them in the hope it would replace the pain with numbness. Appellant was initially pain free after the surgery. Four or five weeks later, however, the pain returned. Another doctor conducted a third surgery in March 2009, but the pain persisted. Appellant then filed the instant action.

At trial, appellant called Leo Murphy, M.D., as an expert witness. Dr. Murphy opined that although respondent acted within the standard of care in performing the surgery on appellant, his follow-up treatment of appellant fell below that standard.[1] The doctor believed that respondent should have performed a thorough differential diagnosis of appellant and injected a nerve block to determine if the pain was neurogenic. According to Dr. Murphy, there was a "grace period" of three to four months during which reparative surgery could be conducted before the nerve injury became permanent.

Jeffrey Johnsrud, M.D., testified as an expert on behalf of respondent. Dr. Johnsrud opined that respondent acted within the standard of care both during and after the surgery. When appellant visited respondent nine days after the surgery, it would have been impossible to distinguish between a nerve injury and post-surgical swelling. When appellant presented to respondent at that time, the pain he complained of was "clearly not abnormal" and did not warrant either a nerve block or physical examination of the area from which the pain emanated. Absent an infection, the standard of care would not call for a second reparative surgery until at least six months to a year after the first surgery.

At the conclusion of the trial, the jury was instructed on the standard of care as follows: "A surgeon is negligent if he fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful surgeons would use in the

---

[1] In his pretrial declaration and deposition, Dr. Murphy opined that respondent committed negligence in performing the hernia surgery. When the doctor testified at trial, however, he changed his opinion on this issue.

3

same or similar circumstances. This level of skill, knowledge, and care is sometimes referred to as 'the standard of care.' [¶] You must determine the level of skill, knowledge, and care that other reasonably careful surgeons would use in the same or similar circumstances, based only on the testimony of the expert witnesses who have testified in this case." The jury was also given a special verdict form in which it was asked (1) whether respondent was "negligent in the diagnosis and/or treatment of" appellant; and (2) whether respondent's negligence was a substantial factor in causing the harm that appellant suffered. The form also instructed the jury that if the answer to the first question was no, the jury was to "answer no further questions, and have the presiding juror sign and date this verdict."

After deliberating over the course of two days, the jury returned a verdict of 11 to 1 in favor of respondent. On the verdict form, the jury answered "no" to the first question and thus did not answer the second question.

*The New Trial Motion*

After judgment was entered in favor of respondent, appellant moved for a new trial alleging that (1) the verdict was against the weight of the evidence with regard to respondent's post-operative treatment of appellant; and (2) the jury committed misconduct by "refusing to follow the court's instructions and refusing to deliberate on one of [appellant's] two theories of negligence, i.e., [respondent's] negligence in [appellant's] post-operative care."

In support of his juror misconduct claim, appellant offered a declaration from Juror Patricia L. Bergman. Juror Bergman stated in pertinent part: "When I said [during deliberations] that we had to look beyond the surgery itself and consider Dr. Drucker's aftercare (or lack of aftercare), another juror said that the testimony about the standard of care was too vague, and that because we were not provided any information on the American Medical Association's definition of the standard of care, we could not find negligence." The declaration also stated "[t]here was extensive conversation and speculation about the American Medical Association's standard," and that "[t]he only evidence jurors discussed was whether Dr. Drucker was negligent during the surgery. I

4

pointed out that there was evidence about negligence in his care after the surgery, but other jurors declined to discuss it because they did not know what the standard of care was."

In opposing the motion, respondent asserted that Juror Bergman's declaration was inadmissible under Evidence Code section 1150, subdivision (a), because it referred to the jurors' subjective reasoning processes. Respondent also offered a conflicting declaration from Juror Melissa Banning. Juror Banning stated in pertinent part: "I specifically do recall that the definition of standard of care was read in the jury room several times from documentation provided to us by the court. . . . I cannot specifically recall if the American Medical Association was mentioned or not. If it was, I do not deny that fact, but I categorically can state that no definition of the American Medical Association was stated by any juror or set forth by any written documentation brought into the jury room. We used the definition provided to us by the court." Juror Banning also stated: "I completely disagree with [Juror Bergman's] statement that 'the only evidence jurors discussed was whether Dr. Drucker was negligent during the surgery.' The aftercare evidence and the definition of standard of care constituting negligence were definitely discussed. I do not recall that any jurors declined to discuss aftercare because they did not know what the standard of care was. I disagree with [Juror] Bergman's statement in that regard. I also disagree with Ms. Bergman's statement . . . that when she tried to ask about Mr. Jones' care after the surgery a juror said 'we don't have to consider that because 9 of the 12 jurors agree that he was not negligent during the surgery.' Again, the surgery, the aftercare and the evidence pertinent thereto were definitely discussed and we applied the definition of standard of care contained in the jury instructions."

When the motion was called for hearing, Judge Barbara A. Lane, who presided at trial, was on medical leave. Due to time restraints, the motion was heard by Judge David Worley pursuant to Code of Civil Procedure sections 660 and 661.[2] Prior to

_____

[2] All further undesignated statutory references are to the Code of Civil Procedure. Section 660 provides that the trial court loses jurisdiction to rule on a new trial motion 60

5

the hearing, Judge Worley issued a tentative ruling denying the motion. After hearing argument from appellant's counsel, the court addressed the following to appellant's counsel: "[Juror] Banning's declaration contradicted [Juror Bergman's declaration] and indicated that they had indeed considered the issues of pain management, postoperative care, and the other issues . . . , so we essentially have conflicting declarations on that. [¶] I'm not going to repeat the law and the thresholds that apply to that kind of an evaluation, but based on the record I have before me and recognizing of course it is a sterile record, I didn't preside at the trial, but, nevertheless, I strike the balance in favor of denying the motion." Appellant filed a timely notice of appeal.

## DISCUSSION

Appellant contends the trial court erred in denying his motion for new trial on the ground of juror misconduct. We conclude otherwise.

Section 657, subdivision 2 provides that the trial court may grant a new trial if the jury committed misconduct that materially affected the substantial rights of the moving party. On a new trial motion alleging jury misconduct, the moving party bears the burden to establish both that such misconduct occurred and that the misconduct was prejudicial. (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625; *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57.) "The standard of review on a new trial motion alleging juror misconduct is abuse of discretion." (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1213.)

In ruling on a request for new trial based on juror misconduct, the trial court applies a "three-step inquiry . . . : Determine whether the affidavits supporting the motion are admissible, whether the facts establish misconduct, and whether the misconduct is prejudicial." (*Bell v. State of California* (1998) 63 Cal.App.4th 919, 932;

days after the moving party is served with a notice of entry of judgment. Section 661 provides in pertinent part that "[t]he motion for a new trial shall be heard and determined by the judge who presided at the trial; provided, however, that in case of the inability of such judge . . . , the same shall be heard and determined by any other judge of the same court." In its order denying the motion, Judge Worley made an express finding that Judge Lane was unable to hear the motion as contemplated in section 661 because she "is presently on medical leave and not expected to return before expiration of the Court's power to rule on th[e] motion pursuant to" section 660.

see also *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160.) "[W]e review the trial court's order, not its reasoning, and affirm . . . if it is correct on any theory apparent from the record." (*Blue Chip Enterprises, Inc. v. Brentwood Sav. & Loan Assn.* (1977) 71 Cal.App.3d 706, 712.)

Respondent claims, as he did below, that appellant's motion fails on the first prong because Juror Bergman's declaration was inadmissible under Evidence Code section 1150, subdivision (a). Although the trial court did not address this claim, we agree with respondent that the declaration was inadmissible and that appellant's new trial motion should have been denied on that basis.

In deciding whether juror declarations are admissible to impeach a verdict, courts "must take great care not to overstep the boundaries established by Evidence Code section 1150." (*People v. Duran* (1996) 50 Cal.App.4th 103, 112.) Subdivision (a) of the statute provides that "[u]pon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

"Evidence Code section 1150 permits evidence from jurors regarding '"overt acts"-that is, such statements, conduct, conditions, or events as are "open to sight, hearing, and the other senses and thus subject to corroboration" [but jurors] may not testify to "the subjective reasoning processes of the individual juror . . . ." [Citation.]' [Citation.] Evidence Code section 1150 'may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations. In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. [Citation.] But when a juror in the course of deliberations gives the reasons for his or her vote, the words are

7

simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.' [Citation.]" (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 475-476.) Where the declaration at issue "suggests '"deliberative error' in the jury's collective mental process-confusion, misunderstanding, and misinterpretation of the law,"' particularly regarding 'the way in which the jury interpreted and applied the instructions,' the affidavit or declaration is inadmissible. [Citation.] The mere fact that such mental process was manifested in conversation between jurors during deliberations does not alter this rule. [Citation.]" (*Id.* at p. 476.)

Juror Bergman's declaration is essentially offered for its statements that "[t]he only evidence jurors discussed was whether [respondent] was negligent during the surgery" because one of the jurors "said that the testimony about the standard of care was too vague, and that because we were not provided any information on the American Medical Association's definition of the standard of care, we could not find negligence." These statements are inadmissible under Evidence Code section 1150 because they suggest deliberative error in the jury's mental process. "Declarations which impugn the jury's mental processes or the jurors' reasons for assenting to the verdict or attempt to show 'that the jury made no findings as to certain matters' are inadmissible under Evidence Code section 1150. [Citations.]" (*Gorman v. Leftwich* (1990) 218 Cal.App.3d 141, 146.)

*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, is instructive. In that case, six jurors submitted declarations stating they had defined battery in a manner that conflicted with the jury instructions and had expressed that misunderstanding during deliberations. In addressing whether the declarations were admissible under the rules of Evidence Code section 1150, the court explained that the moving party sought to "avoid the impact of these rules by focusing on the fact that several of the jurors *communicated* their misunderstanding of the instructions during deliberations. However, '[t]he subjective quality of one juror's reasoning is not purged by the fact that another juror

8

heard and remembers the verbalization of that reasoning.' To hold otherwise would destroy the rule . . . which clearly prohibits the upsetting of a jury verdict by assailing these subjective mental processes. It would also inhibit and restrict the free exchange of ideas during the jury's deliberations.'" (*Id.* at pp. 1683–1684.) The court concluded: "Here, the jurors' statements themselves did not constitute misconduct, nor do they reflect an outside influence brought into the courtroom. Rather, the alleged misconduct arose from the way in which the jury interpreted and applied the instructions. Such evidence is inadmissible." (*Id.* at p. 1684.)

Juror Bergman's declaration relates not only a verbalization of one juror's subjective reasoning, but also purports to establish the effect that statement had on the rest of the jury's reasoning process. Although the declaration technically describes "overt acts," those acts are in essence a description of the subjective reasoning the jurors allegedly employed in reaching their verdict.

This is not a case in which extraneous law was injected into the proceedings by a juror claiming expertise or superior knowledge of the issue at hand. (Compare, e.g., *In re Stankewitz* (1985) 40 Cal.3d 391, 396-400 [juror who said "that as a police officer he knew the law" repeatedly made incorrect statements regarding elements of robbery].) To the extent the purportedly offending juror statement included an erroneous statement of law, our Supreme Court has explained that "[n]ot all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such comments cannot impeach a unanimous verdict; a jury verdict is not so fragile. 'The introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a

9

weakness, however, must be tolerated. "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors." [Citation.] Moreover, under that "standard" few verdicts would be proof against challenge.' [Citations.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1219.)

The statement at issue here relates one juror's reasons for concluding appellant had failed to meet his burden of proving respondent had violated the standard of care. Nothing prevented the other jurors from reviewing the instructions themselves to determine whether they agreed with that reasoning. The mere fact that the statement was made does not amount to misconduct. At most, it is but one manifestation of the human frailties from which few verdicts could withstand such close scrutiny. (*People v. Riel, supra*, 22 Cal.4th at p. 1219.) Juror Bergman's statement that the remark led the rest of the jury to refrain from deliberating on the issue of respondent's negligence was plainly inadmissible. (*Gorman v. Leftwich, supra,* 218 Cal.App.3d at p. 146.) Because appellant offered no admissible evidence to support his claim of juror misconduct, his motion for a new trial on that ground was properly denied. In light of our conclusion, we need not address appellant's remaining claims.**3**

---

**3** We also note that Juror Bergman's credibility was seriously called into question by her own reply to Juror Banning's declaration. Attached to Juror Bergman's reply is a copy of an email she sent to appellant's trial counsel the day after the verdicts were read. In that email, she refers to respondent as "a first-class jerk" and says she was "**stunned**" when nine jurors concluded there was no evidence upon which to base a finding that respondent negligently performed appellant's surgery. According to Juror Bergman, she and two other jurors "**adamantly disagreed**" with this conclusion—apparently notwithstanding the fact that appellant had effectively conceded this issue at trial. The juror goes on to express her "frustration" with the special verdict form, which she erroneously characterizes as requiring the jury to find respondent negligently performed the surgery in order to return a verdict in favor of appellant. She then states: "There was a sense of frustration that the jurors were not given enough evidence to help us make a more comprehensive decision, such as . . . [t]he generally accepted Standard of Care was not specifically **spelled out** so because it was a 'generalization' as to what is considered by the American Medical Association as Standard of Care, we had no specific guidelines to determine whether [respondent] was below the Standard of Care." No mention is made of any juror stating that respondent could not be found negligent because the jury had no information on the American Medical Association's definition of the standard of care.

The judgment is affirmed.  Respondent shall recover his costs on appeal.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

11

Barbara A. Lane, Judge

David Worley, Judge

Superior Court County of Ventura

_____

Ferguson Case Orr Paterson, Wendy C. Lascher, John A. Hribar, for Plaintiff and Appellant.

Carroll, Kelly, Trotter, Franzen & McKenna, Mark V. Franzen, Christy Lee Thomasson, for Defendant and Respondent.