[No. A088418. First Dist., Div. Four. Dec. 21, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN A. MERCED, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V and VI of the Review.

**COUNSEL**

Phillip M. Brooks for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Amy Haddix, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KAY, J.**—At the conclusion of his second trial a jury found defendant Juan A. Merced guilty as charged of the attempted premeditated murder of a peace officer involving the personal use of a firearm (Pen. Code, §§ 187, 664, subd. (e), 12022.5, subd. (a)) and being a past-convicted felon in possession of a firearm (Pen. Code, § 12021, subd. (a)). After finding true allegations that defendant had eight prior felony convictions, the trial court sentenced defendant to state prison for a total term of 65 years to life. Defendant filed a timely notice of appeal. In the published portion of this opinion, we reject defendant's contention that the removal of a prospective juror is to be judged by the same standard for removal of a juror during deliberations. We further conclude that when the prospective juror has expressed a willingness to engage in jury nullification, the trial court is not required to undertake an inquiry into whether the particular details of the case to be tried present a tangible likelihood that, if seated and sworn, the prospective jurors will nullify.

### Background

Establishing the pertinent circumstances of the crimes does not require a lengthy narrative because defendant does not challenge the sufficiency of the evidence to support his convictions.

On the afternoon of September 24, 1996, Oakland Police Officer Crabtree noticed defendant in the vicinity of the Niles Market, managed by Mick Hara. Believing that defendant might be guilty of drinking in public, Crabtree approached and asked defendant for identification. Defendant produced a photo ID, which Crabtree checked against defendant's face. Crabtree "notified the radio dispatcher that I was out on a walking stop and that I was 'Code 4,' " meaning "I didn't need another car. I didn't need any help. It just seemed like it was something that I could handle on my own." Defendant repeated " 'Code 4' " when Crabtree noticed that defendant was concealing his right hand under his shirt. Crabtree "grabbed at that area" because "I like to know where people's hands are at when I'm talking to them." Crabtree felt a gun, which he tried to get away from defendant. Unable to do so, Crabtree pushed defendant backwards. Defendant produced the gun and pointed at Crabtree. Crabtree was backing away and reaching for his weapon. After repeatedly saying "Don't do it, motherfucker," defendant "pulled the trigger on the gun, and it clicked." Crabtree took cover behind his police vehicle. In the ensuing fusillade of fire, Crabtree was knocked off balance by a shot that hit his head. Defendant fled from the scene, but Crabtree was unable to follow in pursuit. Instead, he broadcast defendant's name and description over his radio.

Defendant ran several blocks to the apartment of Sophia Jones. Defendant ran past Ms. Jones (who was standing in front of the apartment building) and into the apartment. A friend of Jones named Tamika Madison told Jones that defendant had a gun and ". . . he wants you." Jones was still at the front of the building when police officers arrived. When the officers knocked on Ms. Jones's apartment door, defendant answered, gave a false name, and claimed that Juan Merced was his brother. Defendant matched the description of the shooter and was arrested. Less than two hours later, gunshot residue was recovered from defendant's hands.

Ms. Jones's apartment was later searched pursuant to a warrant. The search revealed a .38-caliber revolver in a closet and a .38-caliber cartridge in the bed in a child's bedroom. Ms. Jones testified that the gun and cartridge were not hers and she did not have them in her apartment. Ballistic examination revealed that the gun fired a bullet recovered from Officer Crabtree's vehicle. The cartridge had "a shallow firing pin impression on the primer," which "indicated that it may have been a possible misfire."

Officer Crabtree made a positive identification of defendant at trial. So did Mr. Hara, the manager of the store outside which Crabtree was shot.

Carles Buie testified for the defense that he saw the shooting from a distance of approximately 40 yards. The shooter was taller and thinner than defendant, and had a darker complexion.

Officer Crabtree and Mr. Hara testified that defendant had a distinctive ponytail. Sophia Jones testified that a man known as "Boogie," whom she saw earlier that day in the area, had lighter skin than defendant and a ponytail; she did not think that Boogie looked like defendant. Phillip Williams and his brother Joel lived in the same apartment complex as Ms. Jones. Maletia Luckett testified that both of the Williams brothers were with her when they heard shots fired. Both Williams brothers were taken into custody by police for questioning. Gunshot residue was found on Joel's hands but not on Phillip's.

Defendant did not testify.

Additional evidence will be discussed as appropriate in subsequent parts of this opinion.

REVIEW

I

Question No. 64 on the jury questionnaire asked: "Is there any matter that has not been covered by this questionnaire that you feel that you should

mention at this time that might affect your ability to be a fair and impartial juror in this case?" Prospective Alternate Juror Andrew B. answered: "I recognize and believe in jury nullification where appropriate." When Mr. B. was called into the box, the following brief exchange occurred: "THE COURT: Mr. B—, . . . I appreciate your candor, particularly No. . . . 64 about jury nullification. I mean, that's your right. I have no problem with that. My question is this: If you are selected on this jury, and if I instructed you as to the law that implies [*sic*: applies] in the state of California and it went against your conscience for whatever reason, is it reasonable for me to assume that you would not follow the law as I dictate it to you? [¶] MR. B—: It's reasonable for you to assume that. [¶] THE COURT: I'm going to excuse you then Mr. B—. Thank you very much."

The trial court later stated for the record its reasons for excusing Mr. B. "First of all, Mr. B—, on Line 64, says: [']I recognize and believe in jury nullification where it's appropriate.['] One would never know when in his judgment it's appropriate.

"So that's the first thing, he's not inclined to follow the Court's instructions that he must follow if he's selected as a juror. He has a right not to, but I have a right not to let him sit if he's going to engage in jury nullification. So I excused him for that.

"The second reason I excused him, if he was selected on this jury I can see down the line four, five weeks from now we would have an issue then where somebody will report to the Court one juror is not following the instructions of the Court, which leads to more issues and more problems. So in order to avoid that issue down the line, if this man is up there and refuses to follow the Court's instructions, then we'd have to go . . . and bring the foreman down, you know, the whole nine yards, the objections. Again, that's a hot-button issue in the Appellate Court. I'm not going to lay the foundation for this happening. The fact that he believes in jury nullification is enough for me as a challenge for cause. That's my justification."

Defense counsel then stated: "I would submit to the Court the principle is the same, whether you're facing this at the end of the trial or right now, and that is that the Sixth Amendment and the corresponding California Constitutional Amendment clearly gives the defendant a right to trial by his peers. The principles of jury nullification have been with us since Common Law England. Because the jury is the conscience of the community, if one or more jurors simply feel that they do not wish to return a verdict, or that they cannot in good conscience follow the law as the Court gives it, that is the

ultimate right of the juror. That is what is in the Appellate Courts now. [¶] So the objection is as follows: Under the Fifth, Sixth and Fourteenth Amendments, the right of the defendant to due process of law and to a trial by a jury which is diverse and represents all points of view is impaired by this excusal." The trial court then overruled these objections "for the reasons I stated in the record."

 What the trial court called "a hot-button issue in the Appellate Court" has now been settled. In *People v. Williams* (2001) 25 Cal.4th 441 [106 Cal.Rptr.2d 295, 21 P.2d 1209] and *People v. Cleveland* (2001) 25 Cal.4th 466 [106 Cal.Rptr.2d 313, 21 P.3d 1225], the California Supreme Court held that a juror may be removed from a jury if it appears "in the record ' " ' as a demonstrable reality' " ' " that the juror is refusing to deliberate or follow the law in an effort to exercise the naked power commonly known as jury nullification; the theory is that such a juror is "unable to perform his duty" within the meaning of Penal Code section 1089. (*Williams, supra,* at p. 461; *Cleveland, supra,* at pp. 474-475.) Renewing his objections in claiming the ruling was error, defendant contends that Mr. B.'s response does not by itself satisfy the "demonstrable reality" standard of *People v. Williams.* At oral argument, his counsel framed the issue in these terms: "Can a juror be excused for cause based on a general statement that he would exercise the power of jury nullification in an appropriate case without any reference to the case that is pending before the court or . . . without any reference to any particular law that's going to be applied or be relevant in that case that's going to be tried."

Both *People v. Williams* and *People v. Cleveland* involved the dismissal of a juror during deliberations. The situation here is similar but not identical—the issue here involves the excusal of a prospective juror as opposed to discharging a juror during deliberations. Defense counsel maintains that the "demonstrable reality" standard applies to both situations. We disagree.

The demonstrable reality standard first appeared only 30 years ago. It has always been discussed in the context of the removal of jurors who have already been sworn to decide the case and who have heard evidence. (See *People v. Cleveland, supra,* 25 Cal.4th 466, 475, and *People v. Williams, supra,* 25 Cal.4th 441, 461, both citing *People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280], which cites *People v. Johnson* (1993) 6 Cal.4th 1, 21 [23 Cal.Rptr.2d 593, 859 P.2d 673], which in turn cites *People v. Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) The excusal of a *prospective* juror for cause, on the other hand, pursuant to Code of Civil Procedure sections 225 and 230, on the other hand,

is reviewed for abuse of discretion. (E.g., *People v. Holt* (1997) 15 Cal.4th 619, 655-656 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1176 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People v. Morris* (1991) 53 Cal.3d 152, 183 [279 Cal.Rptr. 720, 807 P.2d 949].) The same standard was used prior to enactment of those statutes in 1988, when the excusal of a prospective juror for cause was governed by Penal Code section 1083. (E.g., *Odle v. Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225]; *People v. Craig* (1925) 196 Cal. 19, 25 [235 P. 721]; *People v. Loper* (1910) 159 Cal. 6, 10-11 [112 P. 720].) There is nothing in either *People v. Williams* or *People v. Cleveland* that suggests the Supreme Court intended to impose the "demonstrable reality" standard upon both situations, thus overturning the well-established rule that the excusal of a prospective juror for cause will be overturned only if abuse of discretion is found.

█ Instead, a reviewing court will generally accept as binding a trial court's determination of conflicting or equivocal responses from a prospective juror, which lead to a removal for cause. (E.g., *People v. Ayala* (2000) 23 Cal.4th 225, 257 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Kelly* (1992) 1 Cal.4th 495, 519 [3 Cal.Rptr.2d 677, 822 P.2d 385].) █ The trial court here could have viewed Mr. B.'s answer—"It's reasonable for you to assume that"—as fair warning that the prospective juror might not follow the law as instructed by the court. That answer, on top of Mr. B.'s volunteered belief in jury nullification, was more than an adequate basis on which the court could decide that seating Mr. B. would present an unacceptable risk that yet a third trial might be required. Mr. B.'s answer is more than an adequate basis for finding no abuse of discretion. The same result is allowed under the federal standard, i.e., "that a prospective juror may be excused if the juror's voir dire responses convey a 'definite impression' [citation] that the juror's views 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' [Citation.]" (*People v. Holt, supra,* 15 Cal.4th 619, 650-651.)

Defendant argues that Mr. B.'s response was not sufficiently unambiguous to identify him as a potential nullifier and thus there was no just cause to excuse him. Defendant argues that the trial court was obligated to follow up and explore Mr. B.'s views with respect to the particulars of the case and only then decide if he should be excused. In response to questioning at oral argument, counsel for defendant argued that the trial court ought to have examined Mr. B. about his view of the penal laws defendant was accused of violating. A prospective juror's response that is merely "abstract," which is how counsel characterized Mr. B.'s response, will not suffice and must be connected to the facts of the case at hand to establish a valid basis for

excusing a prospective juror. To require such an inquiry would be contrary to law and fraught with practical perils.

First, to give a prospective juror a thumbnail sketch of the case—based on evidence not yet heard and often not known to the court at that time—and then ask whether that scenario would cause the person to nullify is in plain effect asking a juror to prejudge the case. That is not only contrary to statute and entrenched practice (see Pen. Code, § 1122, subd. (b) [jury admonition not to "form or express any opinion" of the case "until the cause is finally submitted to them"]; Code Civ. Proc., § 611 [same]; CALJIC No. 0.50), it amounts to misconduct for a sitting juror. (E.g., *In re Hitchings* (1993) 6 Cal.4th 97, 118-122 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *Clemens v. Regents of University of California* (1971) 20 Cal.App.3d 356, 361 [97 Cal.Rptr. 589] ["For a juror to prejudge the case is serious misconduct."].) Second, we believe the logic of defendant's argument would not long be limited to questioning about statutory law. Many other factors would likely be just as influential to a person who believes in jury nullification. Whether the person accepts police testimony or scientific evidence, sociological trends or untold other individual factors could also lead a juror to nullify. The information required could be substantial, for no court would want to face the situation where, during deliberations, it becomes apparent that the jury has a nullifier who is motivated by a factor not mentioned during voir dire. Such an approach could take no account of considerations that emerge only during trial. It is too much to expect every individual's hot-button issues could be identified with questionnaires or during voir dire. No one wants a criminal trial to come to a frustrating nondecision because of a nullifying juror telling the court, "Well, you didn't ask about that." Finally, because nullification is such a controversial subject, it might appear that examination would best be conducted individually and in sequestration à la *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301] in order to minimize impact on other prospective jurors. However, this is not an option since passage of Code of Civil Procedure section 223, which directs that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases . . . ." (See *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46].) It is for these reasons of law and practicality that we reject defendant's argument that a trial court must determine the precise basis for, or likelihood of, a prospective juror exercising the power of nullification.

As for defendant's renewal of his constitutional arguments, if defendant has no right to a nullifying juror (see *People v. Williams, supra,* 25 Cal.4th 441, 452-453 [6th Amend. trial right & due process]), it follows he has no right to a prospective nullifying juror.

II-VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment of conviction is affirmed.

Reardon, Acting P. J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 13, 2002.

---

*See footnote, *ante*, page 1024.