Filed 4/28/15  Storz v. Pine Mountain Club Prop. Owners Assn. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ARTHUR STORZ, et al., | F067867 |
| Plaintiffs and Respondents, | (Super. Ct. No. CV-270278) |
| v. | |
| PINE MOUNTAIN CLUB PROPERTY OWNERS ASSOCIATION, INC., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Kern County.  Lorna H. Brumfield, Judge.

Sedgwick, Martin J. O'Leary, Douglas J. Collodel; Soltman, Levitt, Flaherty & Wattles and John S. Levitt for Defendant and Appellant.

Law Office of James E. Noriega and James E. Noriega for Plaintiffs and Respondents.

-ooOoo-

Devin Storz, the 21-year-old son of Arthur and Antoinette Storz,[1] was killed when a large monument Ponderosa pine next to their home blew over during a storm and fell on

---

**[1]** As the plaintiffs and their sons share the same last name, we will refer to them by their first names for clarity.  No disrespect is intended.

the bedroom where Devin was sleeping. Arthur and Antoinette (jointly the Storzes) sued Pine Mountain Club Property Owners Association, Inc. (Pine Mountain), alleging that Pine Mountain was negligent because it refused to allow them to remove the tree that caused Devin's death.[2] At the conclusion of the jury trial, the jury returned a defense verdict in favor of Pine Mountain, finding that while Pine Mountain was negligent, its negligence was not a substantial factor in causing Devin's death. The Storzes moved for a new trial based on several grounds, including juror misconduct, an erroneous special jury instruction, and inconsistent verdict. The trial court granted the motion on the basis of juror misconduct. Pine Mountain appeals the trial court's order granting a new trial.

We conclude that the trial court erred by granting a new trial based on inadmissible statements in juror declarations and the new trial order cannot be affirmed on other grounds. We therefore reverse the order granting a new trial and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The Storzes had two sons, Ian and Devin. In December 1993, the Storzes purchased a home in the community known as Pine Mountain Club, and the family moved in the following year. Pine Mountain managed the community, which consisted of approximately 3,070 lots, 2,500 of which were developed primarily with single family dwellings. When they purchased the property, the Storzes received copies of the governing covenants, conditions and restrictions (CC&Rs) and were aware of the CC&Rs' terms and obligations. They also received copies of the Pine Mountain Club Environmental Control Code (ECC).

The CC&Rs and ECC impose various obligations on homeowners. Among other duties, homeowners are required to maintain their property, including the trees. The

---

[2] The complaint also included a cause of action for premises liability, which the Storzes dismissed at trial.

2.

Storzes understood their property maintenance obligations. The CC&Rs and ECC allow for tree removal only with the express permission of the Environmental Control Officer (control officer) or the Environmental Control Committee (committee). Pine Mountain employed Robert Clark as its control officer beginning sometime in 2004. Clark's duties included patrolling the development and checking for violations of the ECC, such as dead trees, cars up on jacks, fire hazards, brush conditions or houses that needed paint. As part of his duties, Clark drove around the community visually inspecting projects, homes and lots. The only education or training Clark had that qualified him to become the control officer was years of working with the public; he did not have a degree in trees or forestry, and had never worked in a nursery or with an arborist.

On the morning of January 18, 2010, a strong wind caused an approximately 100 foot tall monument Ponderosa pine weighing approximately 10,000 pounds (the pine tree), which was located 10 to 15 feet from the Storzes' home, to fall onto the home, killing Devin. Expert witnesses for each party, both of whom were certified arborists, testified the pine tree had extensive root rot. They disagreed, however, as to whether there were any above-ground signs indicating that the pine tree was diseased or dying.

The Storzes' expert, John Sevier, opined the pine tree was dying, as the pine tree had really limited, rotted roots which caused the pine tree to go into decline and the wood to start getting dry, which in turn attracted beetles that ate through the pine tree from the inside out. According to Sevier, while there were no visible signs of root rot, the dry wood and beetles would have been very visible from above-ground; the process had been going on for about five years. When the wind blew the green part of the pine tree's canopy that the beetles had not yet eaten, the roots could not hold the pine tree and it fell over. Sevier testified that if the still-green branches of a tree with a bad root problem were thinned out, that tree might stand another year.

Pine Mountain's expert, Edwin Slowik, opined that about 60 percent of the pine tree's root ball was decayed and dead due to a fungus. The pine tree fell due to a

3.

combination of its damaged root system and the winds. Slowik explained that when roots decay, they lose their ability to hold a tree up, and when strong winds come in unusual directions, the wind can put enough pressure on a tree to topple it. This is due to the sail effect; if there is a full canopy and strong wind, the tree will catch the wind. If a tree is thinned out, however, it is easier for the wind to go around or through it, and there is not as much force put on the tree.

According to Slowik, when a tree's roots die due to root rot or any root problem, visible signs typically start at the top of the tree, where the tree begins to brown out or change color. While signs of a problem may become visible when approximately half of the roots become infected, the fungus is subtle and a high percentage of the root system can be infected without any visible signs for "quite a while." Visibility depends on the condition of the roots that are healthy, and whether they can provide enough water and nutrients to the treetop. From what Slowik observed of the fallen pine tree and based on photographs provided him, it appeared the pine tree still had a healthy green canopy and he did not see any evidence of beetle infestation. He also did not see other visible signs of root rot, such as conks or a black fungus.

There were a lot of trees on the Storzes' property. To maintain the trees, the Storzes had removed dead trees (including two that Pine Mountain required them to remove) and, from time to time, Arthur would trim the trees himself or hire a tree trimmer. He only trimmed trees when he saw dead branches. Sometime between 2005 and 2007, Arthur got a quote from Joseph Kowalski, a professional tree trimmer, to take down the pine tree or trim it. Arthur did not hire Kowalski to trim the pine tree because he did not see any reason to trim it then. The pine tree appeared healthy to Kowalski when he gave the quote. The last time Kowalski trimmed trees on the property was four or five years before Devin's death; he basically removed dead branches. Kowalski recommended that Arthur trim the pine tree; he told Arthur the dead branches should be

removed and the canopy thinned out so the dead branches would not damage the house if they came down.

Over the years, the Storzes had made requests to cut down the pine tree, but were told it could not be taken down as it was a monument tree that appeared healthy. Sometime before Clark was the control officer, Arthur told the control officer, who he believed was Lee Benevides, he wanted to remove the pine tree and another tree next to it. The control officer told him the committee would have to come and look at the tree before giving its decision. Four to five people on the committee came out to the Storzes' property to view the trees. Arthur told them he wanted to remove the pine tree because he "was afraid of it"; he was concerned the beetles were spreading and that the pine tree was leaning toward the house. The committee, however, looked at both trees and told him on the spot that he could not take them out because they were still green and the pine tree was perfectly healthy. Arthur admitted the pine tree did not appear to be diseased or unhealthy.

The next specific request occurred sometime between 2005 and 2008, when the Storzes wanted to build an addition to the home that would require removing the pine tree and some other trees. They had architectural plans drawn up and got a bid from Kowalski to remove the trees. Arthur then asked Clark if they could remove the trees so they could expand the house, but Clark said no because the trees were healthy and green. The Storzes dropped the plans and never did the addition, as it was impossible unless the trees were gone.

Finally, in May 2009, the Storzes received a letter from Pine Mountain telling them to cut down a dead tree that was near the pine tree, as the tree presented a fire hazard. Arthur and Ian talked to Clark to ask if they could take out the pine tree as well. Arthur told Clark the tree did not look healthy to him and it was leaning more. Clark said he would come out to the property. Clark finally came out and met with Arthur; Clark told him the tree was healthy and he could not take it down because Clark could not get

approval. Dennis Gardner, a friend of Arthur's, overheard the conversation, which was about a tree that was close to the house that was okay to "drop" but the Storzes were concerned with another tree that Clark would not allow them to "drop" because the tree was still alive and did not need to be cut down.

In the summer of 2009, with the help of Ian, Benevides, Frank Sanchez, and a friend, Matt Peternel, Arthur took out the tree referenced in the May 2009 letter. According to Arthur and Ian, at that time, Sanchez and Benevides, who were on the board of directors, told the Storzes they would not let them take "those down," as they were still green, and if they took the pine tree down without permission, there would be a big fine and a lien would be placed on the house.

According to Clark, he had both the authority and the duty to tell homeowners to remove dead trees, including dead monument trees. He also could give homeowners permission to remove live trees up to a certain size. Although under the ECC he had authority to grant requests to cut down monument trees, such as a Ponderosa pine, it was his practice not to exercise that authority on his own as he wanted the committee involved in the decision. If someone came to him and explained why they wanted a tree removed, he would get the committee to visit the site and talk to the owner. The committee typically would allow the owner to take the tree down, but would expect some kind of recompense. Clark had never seen the committee say no to a request to remove trees.

Clark denied meeting with the Storzes on their property in 2007 to look at the pine tree or that he went on the property in 2009 to talk to them about the pine tree. He never noticed the pine tree leaning toward the house during his drive-by inspections. He did not recall Arthur ever telling him he was concerned the pine tree might fall because it was leaning. Clark was not aware of the pine tree before it fell; the pine tree had never been discussed with him before then. Between August 31, 2009 and January 18, 2010, Clark did not see any tree on the property that appeared unhealthy.

Clark testified that if Arthur had asked him for permission to remove a monument tree that appeared healthy, he would not have told him no on the spot and instead would have gone to the committee. According to committee members Mary Ann Knapp and Tom Yancey, the committee does not make a decision about tree removal requests when the committee is on the property inspecting the tree; instead, the committee votes at a formal meeting held later that day. The committee's written decision is sent to the board for final approval. If a homeowner's request is denied, the committee sends a letter to the homeowner advising that the request has been denied and of the homeowner's appeal rights. Yancey had never been told, and was not aware, that the committee ever told Arthur on his property that he could not take down any tree.

If the committee denied a request to remove a tree, there was an appeal process; the homeowner could go directly to the board of directors. Despite the availability of appeal rights, the Storzes never submitted an appeal. The Storzes claimed this was because they did not know they had such a right. Arthur never hired an arborist to come and check the tree, although around 2007 or 2008, Peter Green, an arborist who was doing work for Pine Mountain, looked at the pine tree as a favor to Arthur and gave him his opinion. Green told the Storzes, "if it's not broke, don't fix it."
At one time Arthur said he wanted the pine tree down and did not care what "the clubhouse" said. While the Storzes were unaware before the summer of 2009 that there was a penalty for unapproved removal, they did not take the pine tree down because the committee continued to say no.

*The Jury Instructions and Verdict*

The trial court instructed the jury before closing arguments. Included among the instructions was the following damage instruction, CACI No. 3900, which told the jury: "If you decide that Mr. and Mrs. Storz have proved their claim against Pine Mountain Club, you also must decide how much money will reasonably compensate them for the harm. This compensation is called 'damages.' [¶] The amount of damages must include

7.

an award for each item of harm that was caused by Pine Mountain Club's wrongful conduct, even if the particular harm could not have been anticipated.  [¶]  Mr. and Mrs. Storz do not have to prove the exact amount of damages that will provide reasonable compensation for the harm.  However, you must not speculate or guess in awarding damages."

The trial court also instructed the jury about the respective duties of the judge and jury, including that the judge's duty was to instruct on the applicable law, while the jury was directed to follow the judge's instructions.  The jury also was informed that it would have a copy of the instructions in the jury room.  Then the trial court instructed the jury: "I will now tell you the law that you must follow to reach your verdict.  That's what I've been doing and will continue to do so you must follow the law exactly as I give it to you even if you disagree with it.  If the attorneys have said anything different about what the law means, you must follow what I say.  [¶]  In reaching your verdict, do not guess what I think your verdict should be from something I may have said or done."

In addition, the trial court explained the special verdict form and instructed the panel as follows: "I will give you a verdict form with questions you must answer.  I have already instructed you on the law that you are to use in answering these questions.  You must follow my instructions and the form carefully.  You must consider each question separately.  Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict form in the order they appear.  [¶]  After you [have] answered a question, the form tells you what to do next.  All 12 of you must deliberate on and answer each question.  At least nine of you must agree on an answer before all of you can move to the next question.  However, the same nine or more people do not have to agree on each answer.  [¶]  When you have finished filling out the form, your presiding juror must write the date and sign it at the bottom of the last page and then notify the bailiff that you are ready to present your verdict in the courtroom."

After closing arguments, the trial court provided final instructions, which directed the jurors regarding what to do when they began their deliberations and told them they could ask the trial court to address questions they had about the evidence or about "the laws that apply to the case." During deliberations, the jury submitted two questions about evidentiary matters, but did not ask the trial court to clarify any of the applicable law.

In pertinent part, the special verdict form asked the jury to answer: (1) "Was Pine Mountain Club Property Owner's Association negligent[?]" and, if the answer was "yes" then to answer (2) "Was Pine Mountain Club Property Owner's Association's negligence a substantial factor in causing the death of Devin Storz?" If they answered "no" to the second question, the jury was directed to "stop here, answer no further questions, and have the presiding juror sign and date this form."

During closing arguments, counsel for both sides walked the jury through the verdict form, providing their respective suggestions on how to respond to the questions on the form. The Storzes' counsel argued the jury should answer "yes" to the question of whether Pine Mountain was negligent because (1) it refused to let the Storzes cut down the pine tree, and (2) Clark was not in a good position to evaluate a tree, as he was not trained or educated, and he should have erred on the side of "goodness and safety[,]" rather than on the side of the tree. He further argued Pine Mountain's negligence was a substantial factor in causing Devin's death because, had the Storzes been allowed to cut down the pine tree, the pine tree would not have fallen, and the Storzes' damages were $2.5 million per parent. In contrast, Pine Mountain's counsel argued the jury should answer "no" to the first and second questions. However, counsel suggested that, if the jury answered "yes" to both questions and "was going to put a number" down as the Storzes' damages, that number should be $150,000 each.

After deliberations, the jury returned its verdict for Pine Mountain. On the special verdict form, the jury answered the first question "Yes," finding Pine Mountain negligent, but answered the second question "No," finding that its negligence was not a

9.

substantial factor in causing Devin's death. No other questions on the form were answered and the presiding juror signed and dated the form. Polling revealed the jury voted 11 to one on both questions, albeit with a different juror voting in the negative.[3] The trial court subsequently entered judgment in Pine Mountain's favor.

*Motion for New Trial*

The Storzes timely filed their notice of intention to move for a new trial, enumerating all the grounds set forth in Code of Civil Procedure section 657.[4] They then filed their motion for new trial, in which they argued a new trial should be granted on the following grounds: (1) the trial court committed an error of law by instructing the jury about the nondelegable duty owed by the landowner (§ 657, subd. 7); (2) jury misconduct and irregularity in the jury's proceedings (§ 657, subds. (1) & (2)); (3) insufficiency of the evidence to support the verdict (§ 657, subd. (6)); and (4) the verdict was inconsistent, contrary to instructions, and legally insufficient, and therefore against the law (§ 657, subd. (6)).

With their motion, the Storzes submitted five juror declarations. The declarations principally stated that the jury began its deliberations on Friday, March 22, 2013, when it elected the foreman; no vote was taken that day and deliberations resumed on Monday, March 25; the jury initially was unable to reach a consensus as to question number one on Pine Mountain's negligence, with the vote being eight to four in favor of negligence; and the foreman then advised the jurors that if the jury voted yes to the first question and no to the second, then the judge would decide the amount of money the Storzes would receive, as well as the remaining issues on the verdict form.

---

[3] According to Pine Mountain, the foreman voted "No" to question one.

[4] Subsquent statutory references are to the Code of Civil Procedure unless otherwise stated.

10.

Four jurors placed the foreman's statement at a point in time after the jury's initial vote of eight to four for a finding of Pine Mountain's negligence,[5] while the fifth juror declared it was made after the panel had already voted 11 to one to find Pine Mountain negligent. Three jurors also declared that the foreman made the following additional comments: (1) one juror said the foreman also stated that "the judge with her experience was best to decide the remaining issues"; (2) another juror stated the foreman added that "the judge, who was better able, would make the decision as to the other issues on the verdict form"; and (3) a third juror said the foreman added that "the judge was more qualified than the jury to make the determination as to the amounts to be received by Mr. and Mrs. Storz." One juror further declared that when he walked the foreman to his car after the verdict was read, the foreman said that "he felt badly and that he had misunderstood the jury instructions."

Pine Mountain opposed the motion, contending (1) the jury was instructed properly; (2) there was no juror misconduct because the juror declarations were inadmissible and, in any event, the foreman's statement did not amount to misconduct; (3) the evidence supported the jury's verdict; and (4) the verdict was not against the law. Pine Mountain also filed detailed objections to each declaration, primarily asserting the declarations were inadmissible under Evidence Code section 1150, as they reflected the jurors' thought processes.

Following oral argument, the trial court took the matter under submission. The trial court subsequently entered a written ruling in the court's minutes in which it granted the motion on the ground of juror misconduct, stated the remainder of the motion was moot, and ordered the Storzes to prepare an order pursuant to California Rules of Court, rule 3.1312. In the formal order, the trial court first ruled on Pine Mountain's evidentiary objections, finding that the foreman's statement about the consequences of answering

---

[5] Three of these jurors declared the foreman repeated his statement.

11.

question number one "yes" and question number two "no" was admissible as an erroneous statement of the law, but sustaining objections to other statements in the jurors' declarations as to their thought processes.[6]

In so ruling, the trial court explained: "[The foreman's statement] is an inaccurate statement of law and the five jurors who filed declarations expressed surprise and shock that the [Storzes] did not recover. This is an objectively verifiable event subject to corroboration. [One juror] was so surprised she called counsel for [the Storzes]. It is very difficult to understand how any juror could have believed this representation by the foreperson based on the jury instructions, opening statements, and closing argument where the attorneys went over the verdict forms in detail. If true then the verdict is a miscarriage of justice." The trial court found the declarations established "that the jurors were assured that [the Storzes] would make a financial recovery based on the jury finding that [Pine Mountain] was negligent even if they marked "No" for question #2[,]" and that the foreman admitted he misunderstood the instructions. Based on this evidence, the trial court found prejudicial misconduct had occurred because the five jurors did not follow

---

[6] For example, the trial court sustained objections under Evidence Code section 1150 to the jurors' statements such as (1) after hearing the foreman's statement, "we voted 11 to 1 'Yes' to question no. 1, and 11 to 1 'No' as to question no. 2. It was my understanding, as well as other members of the jury who were in agreement, that the judge would then decide the remainder of the issues"; and (2) "[s]ince we were assured that the Storz[es] would receive monies we voted 11 to 1 to answer 'no' to question 'no. 2.'" The trial court also sustained relevancy objections to statements such as: (1) after learning the result of the verdict, "I was absolutely shocked to learn that the Storz family would receive nothing and that the Pine Mountain Club Association was not held accountable. Shortly thereafter, I contacted [the Storzes' attorney's] office on April 5, 2013, and advised him as to what had occurred"'; and (2) after learning the Storzes would receive no money as a result of the verdict, "I was shocked to hear this and in looking at my fellow jurors, they had expressions of surprise on their faces. I felt that we had been totally misled by the foreman's comments. . . . I was very upset upon learning the result of our verdict, and still am."

12.

the law due to the foreman's erroneous statement that the trial court would determine damages, thereby abdicating their duty.

## DISCUSSION

Pine Mountain's sole contention on appeal is that the trial court erred by granting the Storzes' motion for new trial on the grounds of juror misconduct. The Storzes assert the trial court properly found juror misconduct demanded a new trial and, in any event, other grounds support the trial court's order.

*Jury Misconduct*

The trial court can vacate a verdict and grant a new trial if there is "[m]isconduct of the jury" or an "[i]rregularity in the proceedings of the ... jury." (§ 657.) On a new trial motion asserting jury misconduct, the moving party bears the burden to establish that jury misconduct occurred and that the misconduct was prejudicial. (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625; *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57.)

"'In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation] First, it must determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial.'" (*Sierra View Local Health Care Dist. v. Sierra View Medical Plaza Associates* (2005) 126 Cal.App.4th 478, 484.)

An "irregularity of the proceedings" is a catch-all phrase referring to any act that (1) violates the right of a party to a fair trial and (2) which a party "cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits." (*Gay v. Torrance* (1904) 145 Cal. 144, 149; accord *Gibbons v. Los Angeles Biltmore Hotel* (1963) 217 Cal.App.2d 782, 791.) Jury misconduct during deliberations

13.

that is brought to the attention of a party after the verdict is rendered constitutes an "irregularity of the proceedings" of the jury for purposes of a motion for new trial.

"We review an order granting a new trial on the grounds of juror misconduct for abuse of discretion. [Citation.] '[A]n order granting, as opposed to denying, a new trial is reviewed liberally, particularly with regard to the trial court's finding that an error or irregularity in the original trial was prejudicial.'" (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 182-183 (*Engstrom*), citing *People v. Ault* (2004) 33 Cal.4th 1250, 1255.) We review the trial court's rulings on admissibility of evidence under the abuse of discretion standard of review. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) "In determining misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*).) However, we review independently whether those facts constitute misconduct. (*Ibid.*; *see also Engstrom*, *supra*, 201 Cal.App.4th at pp. 182-183.)

We begin with the admissibility of the jurors declarations. Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Evidence Code section 1150 allows the court to consider evidence of overt acts, while preventing the court from delving into the juror's mental processes. (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1745.) "This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be

14.

neither corroborated nor disproved. . . .' [Citation.] 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 (*Steele*).)

Cases involving the statement of a juror during deliberations require a careful application of the rule of Evidence Code section 1150. If the statement injects into the deliberations evidence or law obtained from a source other than in court, the statement is an admissible overt act of misconduct. (See, e.g., *In re Stankewitz* (1985) 40 Cal.3d 391, 399-400 (*Stankewitz*) [juror made misstatement of law based on his experience as a police officer]; *People v. Honeycutt* (1977) 20 Cal.3d 150, 157 (*Honeycutt*) [juror consulted attorney regarding questions of law involved in the case].) If, on the other hand, the juror's statement reflects his or her deliberative process based upon the law as instructed by the court and evidence received in court, the statement is not admissible to impeach the verdict. (See *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1683-1684 (*Mesecher*) [jurors' misstatement on the law of battery was deliberative error in the collective mental process].) This distinction implements the policy favoring the "'free exchange of ideas during the jury's deliberations.'" (*People v. Cox* (1991) 53 Cal.3d 618, 700 (*Cox*),[7] citing *People v. Elkins* (1981) 123 Cal.App.3d 632, 638 (*Elkins*).)

One example of the distinction is found in *Steele*, *supra*, 27 Cal.4th 1230, where our Supreme Court held that Evidence Code section 1150 renders inadmissible the declaration of jurors stating they would not have voted for the death penalty had they

---

[7] *Cox* was disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.

15.

believed the court's instruction concerning life without the possibility of parole. The *Steele* court explained: "'[E]vidence that the jurors misunderstood the judge's instructions, were influenced by an improper remark of a fellow juror, assented under an erroneous belief that the judge would use clemency or had the legal right to vary the sentence, or had been influenced by inadmissible evidence is simply of no legal significance. [Citation.] In short, under both the common law and Evidence Code section 1150, the jurors' motives, beliefs, misunderstandings, intentions, and the like are immaterial.'" (*Id.* at p. 1264.)

An opposite example is found in *Stankewitz, supra,* 40 Cal.3d 391. There, two jurors declared that another juror stated "that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint … he committed robbery, whether or not he intended to keep them." (*Id.* at p. 396.) Our Supreme Court reversed the judgment, explaining in relevant part: "When extraneous law enters a jury room – i.e., a statement of law not given to the jury in the instructions of the court – the defendant is denied his constitutional right to a fair trial unless the People can prove that no actual prejudice resulted." (*Id.* at p. 397.) The Court determined the juror's statement could be received because the statement itself constituted misconduct. (*Id.* at p. 398.) The juror "violated the court's instructions and 'consulted' his own outside experience as a police officer on a question of law. Worse, the legal advice he gave himself was totally wrong. Had he merely kept his erroneous advice to himself, his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict. But he did not keep his erroneous advice to himself; rather, vouching for its correctness on the strength of his long service as a police officer, he stated it again and again to his fellow jurors and thus committed overt misconduct." (*Id.* at pp. 399-400.)

As these cases demonstrate, while a juror's erroneous statement of the law may be an overt act, a juror's misunderstanding of the trial court's instructions, whether stated or unstated, involves the juror's subjective reasoning process and is inadmissible under Evidence Code section 1150. Here, as in *Stankewitz,* the juror did not keep his misunderstanding of the law to himself. And here, as in *Honeycutt, supra,* 20 Cal.3d 150, 158, the misunderstanding of the law was that of the foreman, "whose perceptions and conclusions may often sway other jurors." But there is no indication that the foreman's misunderstanding of the law was based on his own experience or expertise. Nor was there any evidence that his misunderstanding was obtained from a source extraneous to the judicial process. Instead, the declarations offered in support of the motion for new trial demonstrated merely that at one point in the deliberations the foreman stated the law as he misunderstood it based upon the instructions given by the trial court. As the trial court recognized in its ruling, the foreman admitted he misunderstood the jury instructions.

Nothing prevented the other jurors from reviewing the written instructions and verdict form themselves to determine whether they agreed with the foreman's reasoning. The foreman's statement reflected his subjective mental processes during deliberations and the mere fact the statement was made does not amount to misconduct. At most, it is but one manifestation of the human frailties from which few verdicts could withstand such close scrutiny. (*People v. Riel* (2000) 22 Cal.4th 1153, 1219.) The subjective nature of that process is not changed simply because other jurors heard, remembered and reported the foreman's verbalization of his reasoning. (*Elkins, supra,* 123 Cal.App.3d at p. 638.) As the appellate court observed in *Mesecher, supra,* 9 Cal.App.4th at page 1684: "Here, the juror's statements themselves did not constitute misconduct, nor do they reflect an outside influence brought into the courtroom. Rather, the alleged misconduct arose from the way in which the jury interpreted and applied the instructions. Such evidence is inadmissible."

17.

Based in part on evidence which the trial court itself excluded, such as that the jurors "expressed surprise and shock" that the Storzes did not recover and one juror called the Storzes' counsel due to her surprise, the trial court found misconduct based on its conclusion that the jurors did not follow the law. On appeal, the Storzes argue the foreman's statement is admissible evidence of misconduct because a juror who refuses to follow the law as instructed is not performing his or her duty and therefore is guilty of misconduct, citing *People v. Williams* (2001) 25 Cal.4th 441, 463 (*Williams*); *People v. Brown* (2001) 91 Cal.App.4th 256, 271; and *People v. Merced* (2001) 94 Cal.App.4th 1024, 1028, 1030. These cases, however, address the issue of jury nullification. For example, in *Williams*, our Supreme Court confirmed that the trial court properly dismissed a juror during deliberations where the juror expressly stated he refused to follow the court's instructions because he believed the law was wrong. (*Williams*, *supra*, 25 Cal.4th at pp. 444, 446, 463.) There is no evidence here that the jurors refused to follow the law because they believed it was wrong. At best, the declarations show that the jurors misunderstood the law and the impact of answering the special verdict form as they did.

The instant case also does not involve the situation where the declarations establish that the jurors agreed to disregard the trial court's instructions; in such a situation, the agreement does not implicate a juror's subjective reasoning process but itself constitutes misconduct. (See *People v. Perez* (1992) 4 Cal.App.4th 893, 908 [assuming all jurors discussed the defendant's failure to testify, the discussion constituted an explicit or implicit agreement to disregard the trial court's express instruction not to consider or discuss that issue; therefore, the jury's discussion was admissible to impeach the verdict under Evidence Code section 1150, and constituted misconduct].)

Instead, the declarations address only the jurors' reasons for their votes, i.e. that they believed the foreman's representation about the verdict form and voted based on that belief, which is plainly inadmissible. (See *Gorman v. Leftwich* (1990) 218 Cal.App.3d

18.

141, 146-147 [juror declarations which stated no vote was taken on the issue of causation were inadmissible because they impugned the jury's mental processes, its reasons for assenting to the verdict, or attempted to show it made no findings as to certain matters; no claim was made that the jurors affirmatively agreed to disregard the instructions, which would constitute misconduct].)

Because there is nothing in the record to show the foreman's comment was anything other than an expression of his personal, uninformed opinion, the trial court erred in admitting it as evidence and finding misconduct. In reaching this conclusion, we note California Supreme Court Justice Mosk's cautionary reminder about the principles for limiting juror declarations that seek to impeach a verdict: "I must express my apprehension at an incipient trend, that of losing parties attempting to impeach jury verdicts. We see this in numerous appeals and petitions for review based on juror affidavits. Giving such appeals and petitions any credence prevents the finality of judgments, places additional burdens on the judicial process, and contributes to disenchantment with the tort system. [¶] Most juror affidavits . . . delve into the subjective concerns of the jurors during their deliberations. When deference is given to such affidavits, encouragement is given to opposing counsel in future cases to engage in postverdict competition to obtain juror affidavits revealing discussions that took place behind the closed doors of the deliberation room. Generally the party with the most resources will win that contest. If affidavits purportedly relating jury discussions are permissible, in the interest of accuracy we may as well install recording devices in jury rooms." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 575 (conc. opn. of Mosk, J.).)

The five declarations are the only evidence offered in support of the alleged juror misconduct. In the absence of any admissible evidence, the motion for new trial should have been denied on the ground of juror misconduct. (*Cox*, *supra*, 53 Cal.3d at p. 697; *People v. Sanchez* (1998) 62 Cal.App.4th 460, 476.)

*The Alternate Grounds for the New Trial Motion*

An order granting a new trial must be affirmed if the trial court should have granted a new trial on any ground stated in the motion, regardless of the trial court's stated reasons, with the exception of insufficiency of the evidence, or excessive or inadequate damages, which must be stated in the order. (§ 657.) Where, as here, the trial court specified the grounds and reasons for granting a new trial, but the order cannot be affirmed on those grounds or for those reasons, "the moving party bears the burden on appeal to show that the order should be affirmed on another ground stated in the motion or for reasons other than those specified by the trial court." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1127 (*Bell*), citing *Gaskill v. Pacific Hosp. of Long Beach* (1969) 272 Cal.App.2d 128, 130-132, and *Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 144.).) Accordingly, we consider only the grounds and reasons asserted by the Storzes on appeal.

The Storzes raise two grounds on appeal for affirming the order granting the new trial. First, they assert the trial court made an "error in law" under section 657, subdivision (7), by instructing the jury with Pine Mountain's special instruction number four as follows: "The duty which a possessor of land owes to others to put and maintain it in a reasonably safe condition is nondelegable." The Storzes contend the instruction was inapplicable and should not have been given because the rule it states applies only with regard to the property possessor's liability for the torts of an independent contractor and Pine Mountain's purported liability was not based on that theory. They further argue the instruction was highly prejudicial, as it essentially instructed the jury to award judgment to Pine Mountain since any jury that followed the instruction could only decide for Pine Mountain on the issue of causation.

Our Supreme Court has held there is no rule of automatic reversal applicable to any category of civil instructional error. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548.) In *Soule*, the Court held that "[a] party is entitled upon request to correct,

20.

nonargumentative jury instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Id.* at p. 572.)  When the jury in a civil case receives an improper instruction, prejudice generally will be found only "'"where it seems probable that the jury's verdict may have been based on the erroneous instruction…."'" (*Id.* at p. 574.)

The Storzes are correct that the doctrine of nondelegable duties has been applied as an exception to the general rule that a person who hires an independent contractor is not liable for injuries suffered by third parties caused by the contractor's negligence in performing the work.  (*Koepnick v. Kashiwa Fudosan America, Inc.* (2009) 173 Cal.App.4th 32, 36.)  This exception is described in *Brown v. George Pepperdine Foundation* (1943) 23 Cal.2d 256, as follows:  "'The duty which a possessor of land owes to others to put and maintain it in reasonably safe condition is nondelegable.  If an independent contractor, no matter how carefully selected, is employed to perform it, the possessor is answerable for harm caused by the negligent failure of his contractor to put or maintain the buildings and structures in reasonably safe condition, irrespective of whether the contractor's negligence lies in his incompetence, carelessness, inattention or delay.'"  (*Id.* at p. 260.)

Admittedly, the instant case does not involve an independent contractor.  But just because the doctrine of nondelegable duties has been applied in cases involving independent contractors does not mean the doctrine is not relevant to the issues in this case.  For example, in *Davert v. Larson* (1985) 163 Cal.App.3d 407 (*Davert*), individual owners of real property consisting of common areas in a recreational community were sued after a horse escaped from the land they owned and collided with a car traveling on an adjacent road.  (*Id.* at p. 409.)  Reversing summary judgment in favor of one defendant, the Court of Appeal rejected the defendant's argument that he owed the plaintiffs no duty of care because his interest in the property was small and he exercised no control over management of the property, as he took title to his interest in the property

21.

subject to a recorded declaration of covenants, conditions and restrictions delegating exclusive control of the property to an owner's association. (*Id.* at pp. 409-410.) Noting that a landowner "owes a duty of care to persons who come on his property as well as to persons off the property for injuries due to the landowner's lack of due care in [managing] his property" and that "[g]enerally, the duty owed by a landowner is nondelegable," the appellate court held that "tenants in common of real property who delegate the control and management of the property to a separate legal entity should not be immunized from liability to third parties for tortious conduct." (*Id.* at pp. 410, 412.)

As *Davert* demonstrates, a landowner's nondelegable duty may be an issue even where an independent contractor is not involved. Here, the Storzes had a duty to maintain their property in a reasonably safe condition, which they could not delegate to Pine Mountain. The instruction was relevant to address the Storzes' inferences at trial that Pine Mountain had a duty to inspect the pine tree and hire an expert to assess its condition. The instruction also was relevant as to whether the Storzes were comparatively negligent, as the instruction informed the jury the Storzes could not escape being found negligent by asserting they had delegated their duty to maintain their property in a safe condition to Pine Mountain or anyone else.

Moreover, as Pine Mountain points out, the instruction did not affect the jury's deliberations or their verdict. Although the jury submitted two requests, it did not ask any questions about the special instruction or the Storzes' duties as landowners. In addition, the jury found Pine Mountain negligent. If the jury had construed the instruction as the Storzes' suggest, it would have not found any negligence on the part of Pine Mountain. The trial court did not err in giving the instruction.

The second ground the Storzes assert on appeal as a basis for affirming the new trial order is that found in section 657, subdivision (6), that the verdict was "against law" because it was inconsistent. They essentially contend that once the jury found Pine Mountain was negligent, it was required to find causation. They assert the jury's failure

22.

to find causation could be attributable only to their other claimed errors, i.e. the foreman's improper instruction to the jury and the erroneous special instruction on nondelegable duty.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.) "On appeal, we review a special verdict de novo to determine whether its findings are inconsistent." (*Id.* at p. 358.) "'""Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.'""" (*Ibid.*) A new trial is the proper remedy for an inconsistent special verdict. (*Ibid.*)

The jury was instructed that, to prevail on their negligence claim, the Storzes had to prove that Pine Mountain was negligent, that the Storzes were harmed, and that Pine Mountain's "negligence was a substantial factor in causing" their harm. It was further instructed: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." The jury was also told: "A person's negligence may combine with another factor to cause harm. If you find that Pine Mountain[]'s negligence was a substantial factor in causing the Storz[es]' harm, then Pine Mountain [] is responsible for the harm. Pine Mountain [] cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the Storz[es]' harm." Finally, the jury was instructed that "[a] corporation is responsible for harm caused by the wrongful conduct of its employees while acting within the scope of their employment[,]" that Clark was an employee of Pine Mountain, and if the jury found Clark was acting within the scope of his employment when the incident occurred, then Pine Mountain was responsible for any harm caused by Clark's negligence.

23.

At trial, the Storzes contended Pine Mountain was negligent for two reasons: (1) because it refused to let them cut down the tree; and (2) Clark was not in a good position to evaluate the tree, as he was neither trained nor educated. The jury factually found Pine Mountain was negligent without specifying the way in which it was negligent, as the special verdict form asked only whether Pine Mountain was negligent. The jury further factually found that Pine Mountain's negligence was not a substantial factor in causing Devin's death.

When the jury finds negligence without specifying the way in which the party was negligent, the record is silent on the jury's theory of negligence. (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 585-586.) "'Where, as here, there is no special finding on what negligence is found by the jury, the jury's finding is tantamount to a general verdict. As long as a single theory of negligence is lawfully rebutted on a lack of causation theory, it matters not that another theory of negligence is not so rebutted.'" (*Id.* at pp. 585-586, citing *Jonkey v. Carignan Const. Co.* (2006) 139 Cal.App.4th 20, 24, 26 (*Jonkey*).)

Here, the jury reasonably could have found that, based on Clark's policy of submitting all requests concerning the monument trees to the committee, Clark was negligent when he failed to submit Arthur's requests to cut down the pine tree to the committee, and instead told Arthur on the spot that the tree was healthy and could not come down. The jury further could have found that this negligence was not a substantial factor in causing Devin's death because, even if Clark had involved the committee, the pine tree would have appeared healthy to the committee (as Pine Mountain's expert testified), and the committee would have reached a reasonable, non-negligent, decision not to allow the Storzes to remove it.

Further, the jury reasonably could have found that Clark's negligence did not contribute to the Storzes' failure to remove or trim the pine tree, which ultimately led to Devin's death, based on the following evidence: Kowalski had warned the Storzes of the

24.

need to trim the pine tree because the dead branches could destroy the house if it fell; the pine tree had not been trimmed for at least five years before the accident; as Sevier admitted, had the pine tree been trimmed, it could have stood for another year; as Slowik opined, the pine tree did not exhibit any outward signs of distress that would have put anyone on notice of root rot; the Storzes wanted the pine tree removed, not because they were concerned about the danger it posed, but because they wanted to build an addition; and before 2009, the Storzes were unaware there was a penalty for unauthorized removal of the pine tree, and therefore could have removed it without committee approval if they truly believed the pine tree was dangerous.

Based on this evidence, the jury reasonably could have concluded that the Storzes had the last and best opportunity to take down the pine tree, but elected not to do so, thereby eliminating Pine Mountain's negligence as a substantial factor in the incident. (See, e.g., *Jonkey*, *supra*, 139 Cal.App.4th at pp. 25-26 [the plaintiff, a construction worker, was injured at a construction site when his foot was hit by a falling plank from a scaffold that was being disassembled by the employee of a masonry company; substantial evidence supported jury's verdict that the company's negligence did not cause the plaintiff's injuries as it was obvious the scaffold was being disassembled, the company's employees yelled warnings to the plaintiff but the site was noisy, and one employee waived his hands at the plaintiff, but the plaintiff was focused on his cell phone conversation and was looking at the ground; the jury could have decided the company was negligent only on a failure to warn theory that did not cause the injury].)

As the jury could have found Pine Mountain's negligence was rebutted on a lack of causation theory, the special verdict is not inconsistent. The jury reasonably could have concluded the pine tree fell due to the Storzes' own decision not to remove or trim it rather than any negligent act by Pine Mountain.

In sum, the Storzes have failed to show that the trial court's order must be affirmed on the alternate grounds for the new trial motion.

25.

## DISPOSITION

The order granting a new trial is reversed, and the judgment is affirmed.  Pine Mountain is entitled to recover its costs on appeal.

_____
GOMES, Acting P.J.

WE CONCUR:


_____
PEÑA, J.


_____
SMITH, J.